Jeffrey D. Mokotoff, *pro hac vice*
Elana Gilaad
FORD & HARRISON LLP
100 Park Avenue, Suite 2500
New York, New York 10017
Phone: 212.453.5900
Fax: 212.453.5959
*Attorneys for Defendant Danka Office Imaging Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LARRY POUNCY,

               Plaintiff,

   v.

DANKA OFFICE IMAGING COMPANY,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 06-4777(RPP)

**DEFENDANT'S L. CIV. R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

<u>Document Electronically Filed</u>

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendant Danka Office Imaging Company ("Danka"), by its attorneys, Ford & Harrison LLP, submits the following Statement of Undisputed Material Facts as to which, for purposes of Defendant's Motion for Summary Judgment, Defendant contends there is no genuine issue to be tried.[1]

    1.      Danka is a distributor of office imaging equipment, including photocopy and fax machines, multi-function devices and related software, service and supplies. [Pirrotta Dec. ¶ 4; Pirrotta Tr. 8:20-25].

---

[1] Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts are supported by the Declaration of Jeffrey D. Mokotoff, Esq. ("Mokotoff Dec. ¶__") and accompanying exhibits ("Mokotoff Ex. __"). References to the deposition transcripts of Larry Pouncy and Richard Pirrotta are noted herein as "Pouncy Tr." and "Pirrotta Tr.", and are attached to as Mokotoff Exs. 3 and 50, respectively. References to the Declaration of Lance Redler and exhibits attached thereto are noted herein as "Redler Dec." and "Redler Ex." respectively. References to the Declaration of Richard Pirrotta and exhibits attached thereto are noted herein as "Pirrotta Dec." and "Pirrotta Ex." respectively.

**Senior Sales Executives and Named Account Executives**

2.      Danka's sales force consists, *inter alia*, of Senior Sales Executives a/k/a Geographic Sales Representatives and Named Account Executives ("NAE").  [Pirrotta Dec. ¶ 8].

3.      Senior Sales Executives are generally newly-hired or inexperienced salespersons who are assigned specific "**geographic**" territories in which to sell to **prospective** Danka customers.  [Pirrotta Dec. ¶ 9].  Senior sales executives are assigned zip codes within a specified geographic territory.  [Pirrotta Dec. ¶ 9].  Compared to named accounts, the accounts located within geographical territories are smaller with les revenue opportunity.  [Pirrotta Tr. 31:3-10]. The zip code assignment **excludes** businesses that are identified on another's named account list, major account list or enterprise account list.  [Pirrotta Tr. 31:15-22].

4.      NAEs are generally more-experienced Danka salespeople, who are assigned to sell to specifically denominated accounts, called "named accounts".  [Pirrotta Dec. ¶ 12].  Named accounts consist of both existing and prospective Danka customers, and are generally customers who have been identified as having the potential to purchase multiple pieces of equipment. [Pouncy Tr. 53:8-17; 54:16-19, 121:23-122:14]  [Pirrotta Tr. 23:15-21, 31:11-14].

5.      NAEs are given a list of named accounts to target ("NAE lists").  [Pirrotta Dec. ¶ 13].  NAE lists are ***not*** geographic by nature.  [Pirrotta Tr. 92:4-5, 11-12].  The intent in assigning a NAE a particular list is to ensure the opportunities exist to overachieve his/her goal. [Pirrotta Tr. 30:8-17].

6.      Within the classification of NAEs are several sub-specialties:

        (a) a print-for-pay account executive is a NAE who sells to the specific vertical market of companies who receive payments for printing (*i.e.*, a photocopy store). [Pouncy Tr. 128:12-20].

2

(b) an enterprise account executive is a NAE who sells to a single large customer, such as Staples.  [Pirrotta Tr. 32:16-19].

(c) a national account executive is a NAE who sells to national (as compared to local) accounts with many locations.  [Pirrotta Dec. ¶ 14].

7.    Senior Sales Executives are not permitted to sell to named accounts, even if the named account is located within their assigned zip code or geographic territory.  [Pirrotta Dec. ¶ 10].

8.    NAEs do *not* have **geographic** territories as of right, but will sometimes be given an open or unassigned geographic (zip code) territory in which they are permitted to sell, *as a supplement* to their existing named account list.  [Pirrotta Tr. 31:25-32:6].  Selling to an account – not a **named** account – in an open geographic territory does not give an NAE exclusive or indefinite ownership to that account, as the account may be assigned to another NAE.  [Pirrotta Dec. ¶ 16].  Pouncy *incorrectly* believed that Danka could *not* provide another NAE an account located in an open **geographic** territory assigned to him.  [Pouncy Tr. 112:25-113-5].

9.    NAEs have a higher base salary than a Senior Sales Executive, and, consequently, have a higher sales quota to achieve.  [Pouncy Tr. 63:21-24] [Pirrotta Tr. 53:15-18].  The NAE position is a promotion from the Senior Sales Executive position.  [Pirrotta Tr. 53:23-54:2].

10.    NAEs are expected to sell regularly to many customers at all times- generally four to six orders per month per representative.  [Pirrotta Tr. 90:11-15].

11.    "Ship in credit" occurs when a sale is made to a national account and then the equipment is "shipped in" to a local or subsidiary office in a given territory.  [Pirrotta Dec. ¶ 17].  Credit for the sale is given to the National Account representative, and the local sales representative (NAE) may receive "ship in credit" depending on his/her involvement with the

3

installment of the order, and *if* the account is on the representative's NAE list.  [Pirrotta Dec. ¶ 17].  Danka policy entitles the local representative to 40% split of commission.  [Mokotoff Ex. 20].

12.     One of the ways Danka measures the size of its customer is by "Machines in Field" ("MIF"), which is a count of the actual number of pieces of equipment that Danka has placed at a customer's location.  [Pouncy Tr. 48:7-12]  [Pirrotta Tr. 34:25-35:2, 35:19-23; 36:5-10].  Because MIF includes copiers of varying expense, fax machines, and other equipment, it is not, necessarily, an accurate measure of the value of an account.  [Pirrotta Dec. ¶ 18].  Danka does *not* seek to make the MIF equal among NAE lists.  [Pirrotta Tr. 37:13-16].

13.     Danka issues annual compensation plans that establish for the compensation scheme paid to its sales force, including Senior Sales Executives and NAEs.  [Pirrotta Dec. ¶ 19]. The compensation plan sets forth Danka's policies for compensation, commissions, ship-in credits, splitting of commissions, and policies against poaching accounts from other representatives.  [Mokotoff Ex. 52].

14.     Compensation is a combination of base salary and commissions, based upon achieving sales quota.  [Pirrotta Dec. ¶ 20].  Commission is based on gross profit and revenue. [Pirrotta Tr. 130:24-131:4].

15.     Quotas represent the amount of revenue that a Danka employee must achieve within a particular time period.  [Pouncy Tr. 63:25-64:4].  Pouncy believes Danka's Compensation Board established his quotas.  [Pouncy Tr. 92:23-24].  Pirrotta has never been on the Compensation Board.  [Pirrotta Tr. 49:25-50:2].

16.     Danka determines sales quotas based upon annual guidelines it receives from Danka's corporate office.  [Pirrotta Tr. 37:25-38:3].  The corporate office issues both salary

guidelines and quota guidelines.  [Pirrotta Tr. 39:21-25].  Within the assigned territory, quota would be calculated based on in part on the MIF, the number of the different segment machines, opportunities, expiration dates of existing sales and knowledge of competitor contracts.  [Pirrotta Tr. 40:13-25].

17.     On an annual basis, Danka sales representatives meet with their supervisors to review and sign a Sales Compensation Acknowledgment Form ("SCAF").  [Pirrotta Dec. ¶ 21]. The SCAF sets forth the annual current salary of the sales representative, and his/her quarterly sales goals.  [Pirrotta Dec. ¶ 21].

18.     Danka's territory assignments are generally examined and re-aligned at the beginning of the fiscal year, consistent with branch and corporate strategy.  [Pirrotta Tr. 79:14-25].  Territory changes apply to both geographical territories and NAE lists, based on business need.  [Pirrotta Tr. 96:21-24].  An example of business need would be a decision to verticalize a market.  [Pirrotta Tr. 96:25-97:5].

**The Company's EEO/ Anti-Harassment Policy and Complaint Procedure**

19.     Danka is an equal opportunity employer that maintains a written Equal Employment, Non-Discrimination and Anti-Harassment Policy ("the EEO Policy").  [Pirrotta Dec. ¶ 5, Ex. A].

20.     The EEO Policy is included in orientation materials given to each newly hired employee, posted in work areas, and available to all employees via Danka's Human Resources Department.  [Pirrotta Dec. ¶ 6].

21.     The EEO Policy includes a comprehensive anti-discrimination policy and complaint procedure for reporting incidents of harassment, discrimination or retaliation. [Pirrotta Dec. ¶ 7, Ex. A].

5

22.    During Pouncy's employment with Danka, Danka maintained a Human Resources Department in its Port Washington office.  [Pirrotta Dec. ¶ 24].  Mayela "Maggie" Montanez was Danka's Divisional Director of Human Resources, located in Port Washington, during Pouncy's employment.  [Pouncy Tr. 151:16-22].  Montanez is Hispanic.  [Pouncy Tr. 152:16-17].

**Pouncy's Prior and Subsequent Employment History**

23.    Pouncy has a history of being terminated from sales positions:

- In September 1999, Potamkin Cadillac terminated him because of an argument Pouncy had with his Sales Manager.  [Pouncy Tr. 17:1-24].

- Niello Porsche terminated Pouncy, but he was "not for sure the reason."  In a race discrimination lawsuit he filed against Niello Porsche, Pouncy states Niello Imports told him his employment was being terminated for "failure to follow directions."  [Pouncy Tr. 24:18-23; 27:2-10]  [Mokotoff Ex. 4].

- Pouncy is "not for sure" whether Future Ford terminated his employment. [Pouncy Tr. 23:7-18].

- He does not know whether Newmark and Lewis terminated him.  [Pouncy Tr. 31:10-17].

- In February 2008, he "resigned" from his employment at Ikon, a competitor of Danka, after Ikon offered him a demotion because Pouncy was not bringing in any revenue dollars.  [Pouncy Tr. 332:3-333:6].

**Pouncy's Employment and Salary History at Danka**

24.    On December 15, 1999, Danka hired Pouncy into the entry-level position of Senior Sales Executive, at the annual salary of $24,000.  [Pouncy Tr. 39:15-21, 40:21-41:16]. Jay Feldman and Patrick Orvis hired Pouncy.  [Pouncy Tr. 39:4-9; 39:25-40:3].

25.     Pouncy had no prior experience selling business and office equipment.  [Pouncy Tr. 35:3-12].

26.     As a Senior Sales Executive, Pouncy was assigned to geographic territories in Brooklyn (Kings County), New York.  [Pouncy Tr. 42:13-20; 46:25-47:15].

27.     Pouncy identifies his race as Black.  [Mokotoff Ex. 31].

28.     From the date of his hire through June 9, 2000, Pouncy's immediate supervisor was Patrick Orvis.  [Pirrotta Dec. ¶ 27].  From July 10, 2000 through September 1, 2000, Pouncy's immediate supervisor was Alan Bolcar.  [*Id.*].  From October 18, 2000 through January 1, 2003, Pouncy's immediate supervisor was Aaron "Bob" Chase.  [*Id.*].  From January 13, 2003 through February 13, 2003, Pouncy's immediate supervisor was Art Rios, Jr.  [*Id.*].  From March 17, 2003 through December 20, 2004, Pouncy's immediate supervisor was Lance Redler.  [*Id.*].

29.     Danka maintained a branch office at 4 Tri Harbor Court, Port Washington, New York and 38 Harbor Park Drive, Port Washington, New York (Nassau County, Long Island), and during all times of his employment, Pouncy and his immediate supervisors worked out of the Port Washington, New York branch.  [Pirrotta Dec. ¶ 22].

30.     From 1997-2002, Richard Pirrotta ("Pirrotta") was Danka's Regional Director.  [Pirrotta Tr. 7:10].  In 2002, he became the Divisional Vice-President.  [Pirrotta Tr. 7:4-10].  In October 2006, Pirrotta became Danka's Market Vice-President.  [Pirrotta Dec. ¶ 2].  From 2002 through January 2007, Pirrotta's territory encompassed Philadelphia through Maine (but not Rochester), and he had at least 300 employees in his territory.  [Pirrotta Tr. 9:2-4, 12-14] [Pirrotta Dec. ¶ 3].  Pirrotta oversaw the Danka offices in New York City and Port Washington, Long Island.  [Pirrotta Tr. 18:2-6].

31.     Pirrotta worked at Danka's New York City office at 90 Park Avenue, New York, New York, and visited the Port Washington branch monthly.  [Pouncy Tr. 108: 10-23].  Pouncy never worked out of Danka's New York City office.  [Pirrotta Dec. ¶ 25].

32.     Pouncy did not report directly to Pirrotta.  [Pirrotta Dec. ¶ 26].  Only the Port Washington Branch sales manager(s) reported directly to Pirrotta.  [Pirrotta Tr. 68:19-69:3]. [Pirrotta Dec. ¶ 26].

**Pouncy's Performance as a Senior Sales Executive**

33.     As a Senior Sales Executive, Pouncy's quarterly revenue quota was $105,000, or $35,000 per month.  [Pouncy Tr. 60:4-9].

34.     As a Senior Sales Executive, Pouncy was assigned a zip code territory that consisted of half of Brooklyn, New York.  [Pouncy Tr. 46:25-47:15].  Dennis Launer (White), another Senior Sales Executive in Danka's Port Washington office, was assigned to sell in the other half of the zip codes in Brooklyn.  [Pirrotta Dec. ¶ 28].  As Senior Sales Executives, Pouncy and Launer were *not* permitted to sell to named accounts that were located within their zip code territories.  [Pirrotta Dec. ¶ 29].

35.     On June 15, 2000, Jay Feldman, Danka's Senior Area Manager, issued Pouncy a memorandum entitled "Expectations" which addressed Pouncy's failure to meet his quarterly quotas as a Senior Sales Executive.  [Mokotoff Ex. 5].

36.     On December 1, 2000, Pouncy's Area Manager, Bob Chase, issued him a Letter of Concern regarding his failure to meet sales quotas, since Pouncy had produced revenues of $106,807 against a goal of $280,000, or *38%* of plan.  [Mokotoff Ex. 6].  This Letter set forth an action plain for Pouncy to achieve, reminded Pouncy that he had management support, and

cautioned that failure to achieve the goals may result in further action, including termination. [*Id.*].

37.    In mid-2000, Pirrotta offered, and Pouncy accepted a non-recoverable draw of $1500 a month for two months.  [Mokotoff Ex. 7]  [Pirrotta Dec. ¶ 30].  Pirrotta provided Pouncy with the extra money (which would be equivalent to a commission payment had Pouncy made quota), as a discretionary bonus, because he supported Pouncy's potential as a successful sales representative, Pouncy had complained about the lack of direct management support, Pouncy had complained about his level of income, and because Pouncy was relatively new to the company.  [Pirrotta Tr. 74:5-9]  [Pirrotta Dec. ¶ 30].  Specifically, at that time, Alan Bolcar was serving as the interim supervisor for Pouncy's team in the Port Washington office.  [Pirrotta Dec. ¶ 30].  Pirrotta had never given any other such payment to an existing employee.  [Pirrotta Tr. 72:5-9, 74:10-12].  Pouncy believed that he did not deserve the bonus.  [Pouncy Tr. 75:13-17].

38.    In April 2001, Pouncy asked Pirrotta for a promotion to the position of NAE, because he was unhappy with his salary.  [Mokotoff Ex. 7].

39.    Pirrotta informed Pouncy that if he exceeded his sales goal of $35,000 for two (2) of the three (3) months in the current quarter of 2001, Pirrotta would support Pouncy's promotion to NAE.  [Mokotoff Ex. 7].

40.    During the month of April, Pouncy had no sales.  [Mokotoff Ex. 7].  As of May 2001, Pouncy had achieved only forty-seven percent (47%) of his sales quota during ***the prior twelve months***.  [*Id.*].  In fact, Pouncy had achieved his sales quota in only ***two (2)*** of the prior ***fifteen*** months.  [*Id.*].

41.    Pirrotta explained to Pouncy that if he were to be promoted to NAE, his salary would increase, but so would his monthly sales quotas.  [Mokotoff Ex. 7].

**In July 2001, Pirrotta promotes Pouncy to NAE**

42.     By learning how to "strategize a deal" from sales manager Alan Bolcar (white), Pouncy achieved the sales performance expectations identified by Pirrotta.  [Pouncy Tr. 81:20-82:15].

43.     Pirrotta promoted Pouncy to NAE effective July 1, 2001.  [Pirrotta Tr. 89:18-23; 54:7-15]  [Pouncy Tr. 54:7-9].

44.     As a NAE, Pouncy's salary increased 50% from $24,000 to $36,000.  [Pouncy Tr. 85:11-12; Mokotoff Ex. 8].  Pirrotta approved Pouncy's salary increase.  [*Id.*].

45.     As a NAE, Pouncy's monthly quota increased to $60,000, or $180,000 per quarter.  [Mokotoff Ex. 8].  Per Danka policy, Pouncy's quota increase was implemented gradually, and he was assigned a $40,000 monthly quota for July 200, a $50,000 quota for August and September 2001, and a $60,000 quota for October 2001 and thereafter.  [Pouncy Tr. 90:15-21]  [Mokotoff Ex. 8].

46.     As a NAE, Pouncy was assigned a NAE list from which he was to solicit business.  Pouncy's NAE list consisted primarily of customers located in Brooklyn, New York, and also included Staten Island and a select group of customers in the Bronx.  [Pouncy Tr. 96:14-17; 101:13-19].

47.     As a NAE, Pouncy was also permitted to sell to potential customers within open or unassigned geographical territories.  [Pouncy Tr. 96:23-97:12].  Pouncy understood that while some of his **named accounts** were located in Brooklyn, that did not afford him exclusivity of the Brooklyn geographic territory.  [Pouncy Tr. 215:20-23, 216:5].

48.     The decision of whether to hire a candidate for a sales position as a sales executive or named account executive was based on factors including industry experience,

general sales experience, professional sales experience, and competitive opportunities. [Pirrotta Tr. 58:8-18].

49.   Frank Spindel (white) was hired by Danka as a NAE on or about March 1, 2001, at an annual salary of $36,000. [Pirrotta Dec. ¶ 40]. Spindel had twenty years of sales experience at the time he was hired by Danka, including ten years of electronic sales experience. [*Id.*]. Spindel worked out of Danka's Port Washington office. [*Id.*].

50.   Dennis Launer (white) was promoted from a Senior Sales Executive to a NAE on or about January 1, 2001. [Mokotoff Ex. 50]. Launer's salary was increased from $24,000 (as a Senior Sales Executive) to $36,000 (as a NAE). [*Id.*].

**Pouncy's Unsatisfactory Performance as a NAE**

51.   In May 2001 and thereafter, Pirrotta reminded Pouncy of the numerous avenues available to him for assistance with sales strategies [Mokotoff Ex. 7]:

a.   Pirrotta reminded Pouncy of the resource of his direct supervisor, Bob Chase, and advised Pouncy that he had spoken with Chase and Chase was committed to assisting Pouncy. [Mokotoff Ex. 7].

b.   Pirrotta offered to make himself available to Pouncy for additional assistance before and after regular business hours, *i.e.*, before 8:00 a.m. and after 5:00 p.m. [Pouncy Tr. 162:12-17] [Mokotoff Ex. 7].

c.   Pirrotta offered Pouncy the additional resource of Eurel Tobias, a director of Major Accounts for Danka, and "one of the best strategists" Pirrotta ever worked with. [Pirrotta Tr. 185:8-19].

d.   Pirrotta offered to accompany Pouncy on a call to a customer. [Mokotoff Ex. 7].

e.      Pirrotta reminded Pouncy of the resources available at the Danka Knowledge Center, including webinars.  [Mokotoff Ex. 7].

f.      On several occasions, Redler accompanied Pouncy to customer meetings and helped him successfully close deals.  [Redler Dec. ¶ 5].

52.     Pouncy successfully sought out Mr. Tobais' assistance with strategizing a deal on at least one occasion.  [Pouncy Tr. 160:23-161:12].

53.     In September 2002, when Pouncy complained that Pirrotta *only* offered to give him assistance before and after work, Danka's Human Resources department clarified that Pirrotta was *not* limiting his assistance to those time periods.  [Mokotoff Ex. 16].  Thereafter, Pouncy can recall **no instance** when he attempted to obtain assistance in selling to a customer and was denied that assistance.  [Pouncy Tr. 202:3-20].

54.     In October 2002, Pouncy acknowledged to Pirrotta that Chase was willing to accompany Pouncy on sales opportunities, but that Pouncy declined Chase's offers.  [Mokotoff Ex. 17].

55.     On December 10, 2001, Pouncy's Area Manager, Chase, issued a Performance Improvement Plan since Pouncy had produced revenues of $194,335 against a goal of $385,000, or 53% of plan.  [Mokotoff Ex. 9].  The memo set forth an action plan for Pouncy, reminded him of the availability of management support, and cautioned that a failure to improve could result in further action, including termination.  [*Id.*].

56.     In October 2002, Pirrotta counseled Pouncy regarding his underutilization of the geographic territories assigned to him, as Pouncy had not worked in Staten Island, even though that territory had been assigned to him since May 2002.  [Mokotoff Ex. 18].

12

57.     On January 31, 2003, Pouncy received a Letter of Concern from his supervisor, Art Rios, for reasons including unacceptable performance with respect to his production, weak funnel of prospective activity, and non-compliance with being in the office each day by 8:00 a.m. [Mokotoff Ex. 19]. The Letter cautioned that failure to demonstrate positive change could result in further disciplinary action. [*Id.*]. Pouncy does not believe Mr. Rios was discriminating or retaliating against him by providing the letter of concern. [Pouncy Tr. 212:9-25].

58.     On January 31, 2003, Rios issued similar Letters of Concern to NAEs Joan Moore and Samuel DeChelfin. [Mokotoff Ex. 57]. Joan Moore and Samuel DeCheflin are both White. [Pirrotta Dec. ¶¶ 41, 42].

**Assignment of Territories and Accounts to Plaintiff**

59.     Pirrotta did not create territories at Danka. [Pirrotta Tr. 25:10-14].

60.     In response to Pouncy's complaint about territories, Pirrotta directed Pouncy back to local management, as they were the decision-makers. [Mokotoff Ex. 11].

**A.     Dick Bailey Account**

61.     Dick Bailey is a print-for-pay account. [Pirrotta Tr. 132:21-133:2]. Dick Bailey appeared as a named account on Pouncy's list as of February 2002. [Pirrotta Tr. 141:25-142:6] [Mokotoff Ex. 53].

62.     In April 2002, Dick Bailey was assigned to Dennis Launer ("Launer"), because there was a decision to create a print-for-pay vertical market. [Pirrotta Tr. 139:14-140:2] [Pouncy Tr. 129:3-8] [Pirrotta Dec. ¶ 31]. Bob Chase made the decision regarding which accounts to assign to Launer. [Pirrotta Tr. 140:15-17] [Mokotoff Ex. 11] [Pirrotta Dec. ¶ 31]. Pouncy did not believe it was unfair that Launer was assigned the print-for-pay accounts. [Pouncy Tr. 129:18-24].

63.     In addition to Pouncy, other NAEs also had print-for-pay business reassigned to Launer.  [Pirrotta Tr. 97:19-22].  Also, once Launer was made a print-for pay sales executive, most, but not all, of his non-print for pay accounts were reassigned to other NAEs.  [Pirrotta Tr. 98:4-8].

64.     Despite the reassignment, Pouncy continued to visit Launer's Dick Bailey account, and attempt to sell to the account.  [Pirrotta Dec. ¶ 32].

65.     On May 1, 2002, Chase issued a memorandum to Pouncy, reminding him that the Dick Bailey account was Launer's account, and that if Pouncy wrote an order within the next 30 days (*i.e.* before May 31, 2002), the commission would be split between Launer and Pouncy. [Pouncy Tr. 132:22-133:3] [Mokotoff Ex. 10].  The memo further cautioned against poaching – a practice where a sales representative solicits business from a territory or account that is not assigned to him or her.  [Mokotoff Ex. 10].

66.     Pouncy sold machines or equipment to Dick Bailey in August 2002, but that account was not on his list at the time of the order.  [Pirrotta Dec. ¶ 33].  Even though the sale occurred after the deadline set forth in Chase's May 1, 2002 memorandum, and Pouncy was not entitled to any commission, Chase and Pirrotta permitted Pouncy the benefit of 50% of the commission from the sale.  [Pirrotta Tr. 137:10-138:2]  [Pouncy Tr. 130:25-131:2].  Pouncy believes he should have received 60%.  [Pouncy Tr. 135:9-12].

**B.     Health Plus Account**

67.     In or about 2000, when both Pouncy and Launer were Senior Sales Executives, the account Health Plus had several locations in Brooklyn, New York, including one location located within Pouncy's geographic territory, and one location located in Launer's geographic territory.  [Pirrotta Tr. 118:24]  [Pirrotta Dec. ¶ 34].

68.     Pouncy dates his dispute concerning the assignment of the Health Plus account to **March 2000**, at the time he was a Senior Sales Executive, and first contacted the account. [Pouncy Tr. 105:24-106:3]. Both Launer and Pouncy called on Health Plus in their respective geographic territories. [Pirrotta Tr. 113:25-114:4].

69.     Danka Manager Jay Feldman (who hired Pouncy) assigned Launer the Health Plus account as a **named account** when Launer became a NAE in January 2001. [Mokotoff Ex. 11].

70.     In 2000, Launer made the first *successful* contact with Health Plus by a cold call. [Pirrotta Dec. ¶ 35]. Launer also met the CFO of Health Plus at a Chamber of Commerce Event. [Pirrotta Dec. ¶ 35]. Pirrotta accompanied Launer to a meeting with Health Plus, and Launer closed the deal. [Pirrotta Tr. 114:17-19; 116:13-20].

71.     At least as of August 23, 2001, Health Plus was a named account of Dennis Launer. [Pouncy Tr. 346:13-16] [Mokotoff Ex. 47].

72.     Pouncy never sold to Health Plus. [Pirrotta Dec. ¶ 35].

**C.     SUNY Downstate**

73.     In or about January 2001, Mr. Chase assigned NAE Arthur Sperber (White) the SUNY Downstate account. [Pouncy Tr. 131:21-132:18, 194:12-15] [Pirrotta Dec. ¶ 36].

74.     SUNY Downstate was a named account, located in Brooklyn, New York. [Pirrotta Dec. ¶ 36].

75.     Pouncy, who at the time was a Senior Sales Executive, claims that he should have been assigned the SUNY Downstate account because it was located within his **geographic** territory in Brooklyn. [Pouncy Tr. 131:23-132:10]. Again, a Senior Sales Executive has no ownership over **named** accounts in his geographic territory. [Pirrotta Dec. ¶ 10].

76.     Sperber had handled other SUNY accounts for four (4) years at the time he was assigned the SUNY Downstate account, including SUNY Brooklyn, and SUNY Health Science Center.  [Pirrotta Dec. ¶ 36].

**D.     Premier Home Healthcare**

77.     Pouncy sold to Premier Home Healthcare in or about July 2002 in Brooklyn. [Mokotoff Ex. 59].

78.     One of Danka's **enterprise account managers**, Steve Hirsh, was responsible for *all* accounts for the City of New York.  [Pirrotta Tr. 129:7-130:2].

79.     Premier Healthcare is a subsidiary of YAI, which is an agency of the City of New York, and therefore one of Hirsh's accounts.  [Pirrotta Tr. 129:7-13]  [Mokotoff Ex. 16].

80.     Hirsh did not work out of the Port Washington office.  [Pouncy Tr. 217:4-9, 18-22].

81.     After Pouncy made this sale, Hirsh contacted Pouncy to notify him that Premier Healthcare is an agency of the City of New York, and, consequently Hirsh's account.  [Mokotoff Ex. 16].  Pouncy was required to split his commission with Hirsh, as the sale was made to Hirsh's client.  [*Id.*].

82.     According to Danka policy, Pouncy should have received only 40% of the commission, but Danka permitted Pouncy the benefit of receiving 50% of the commission. [Mokotoff Ex. 16].

**E.     Splitting of Brooklyn Territory**

83.     Brooklyn was previously a single geographic territory, but Danka made a decision to split Brooklyn into two (2) geographic territories to maximize business opportunities, likely at the start of the fiscal year.  [Pirrotta Tr. 90:21-92:7].

16

84.     Pouncy believes the splitting of the Brooklyn territory, and the "removal of literally half of his accounts" occurred in March/April 2002.  [Pouncy Tr. 143:18-25-144:6; 206:6-11, 349:6-13]  [Mokotoff Ex. 48].

**F.     Pouncy Retained His Bronx Accounts**

85.     Pouncy was responsible for at least two named accounts in the Bronx- Beth Abraham Family Hospital and HW Wilson, Inc.  [Mokotoff Ex. 51].

86.     When Launer was assigned open geographic territories in the Bronx in 2003, Redler advised Pouncy and Launer that Pouncy was to continue to cover his Bronx named accounts.  [Mokotoff Ex. 51].

**Pouncy's Complaints Regarding His Salary**

87.     Pouncy understood that an increased salary would be accompanied by an increase in quota.  [Pouncy Tr. 142:7-11].

88.     While Pouncy was a NAE, his base salary was $36,000.  [Pirrotta Dec. ¶ 37]. While Pouncy was a NAE, his quota was never higher than $60,000 per month.  [Pouncy Tr. 140:14-21, 223:11-16].  In fact, as of May 2004, his monthly quota was approximately $45,000 per month, yet Danka continued to pay Pouncy base compensation of $36,000/year.  [Mokotoff Ex. 21].

89.     During the time Pouncy was a NAE, the starting salary for the position was $32,000.  [Pirrotta Dec. ¶ 38].

90.     During the time Pouncy was a NAE, the minimum sales quota was $50,000 per month.  [Pirrotta Dec. ¶ 39].  Pouncy's quota dropped to below that minimum.  [Mokotoff Ex. 21].

91.     Joan Moore (White female) was a NAE in the Port Washington office, who had been employed at Danka for over 20 years.  [Pirrotta Dec. ¶ 42].  As of January 2003, Moore's base salary was $48,000 and her quota was $262,100 per quarter, or $87,366/ month.  [Pirrotta Dec. ¶ 42].  As of February 2003, NAE Dennis Launer's base salary was $38,000, and his quota was $231,700 per quarter, or $77,233/ month.  [Pirrotta Dec. ¶ 42, Ex. C].

92.     Arthur Sperber (White) was a NAE in the Port Washington office.  [Pirrotta Dec. ¶ 43].  His salary as a NAE was initially $36,000 on July 1, 2001.  [*Id.*].  On October 1, 2001, Sperber's salary was adjusted ***downward*** to $32,000.  [*Id.*].  On April 1, 2002, Sperber's salary was adjusted upward to $34,000.  [*Id.*].  As of February 2003, Sperber still made $34,000, and his quota was $231,700 per quarter, or $77,233/ month.  [Pirrotta Dec. ¶ 43; Ex. B].  In other words, Sperber made **less than** Pouncy with a higher quota to meet than Pouncy.  [Pirrotta Dec. ¶ 43].

## Pouncy's Complaints

93.     In December 2001, Launer submitted a formal complaint to Human Resources concerning Chase.  [Mokotoff Ex. 54].  Launer claimed that Chase was unprofessional, and did not help Launer "develop new business, close business or solve problems."  [*Id.*].

94.     Chase served as a manager for two years, then voluntarily stepped down and returned to individual production in early 2003.  [Pirrotta Tr. 144:6-8].

95.     On August 5, 2002, Pouncy sent an e-mail to Human Resources outlining several complaints, including:  (1) territory list; (2) communication; (3) respect (claims of retaliation) and (4) desire for stronger leadership in Port Washington.  [Mokotoff Ex. 12].

96.     Montanez investigated the complaints identified in Pouncy's August 5, 2002 e-mail, met with Pouncy and Pirrotta on September 4, 2002, and documented her findings to Pouncy in a memo dated September 10, 2002. [Mokotoff Ex. 12].

97.     At the September 4, 2002 meeting, Pirrotta explained to Pouncy the complexities in creating territories, responded to Pouncy's concern of poor management by promising to speak with Chase and offering both his and Mr. Eurel Tobias' assistance with strategizing, and suggested that Pouncy schedule a follow up meeting with Pirrotta in October 2002. [Mokotoff Ex. 12].

98.     Montanez found no evidence to corroborate Pouncy's complaint of retaliation by Chase. [Mokotoff Ex. 12].

99.     Pirrotta counseled Chase in response to Pouncy's complaint that Chase did not support him, asked Pouncy to try to work with Chase again, and offered Pouncy additional assistance. [Pirrotta Tr. 142:10-17].

100.    Chase reported to Pirrotta that he had problems with Pouncy, including:  (a) Pouncy would continue to visit Dick Bailey after the account had been assigned to Launer; (b) Pouncy refused to turn in paperwork in a timely manner; (c) Pouncy did not report to work and did not call in absent; and (d) assignment of the Health Plus account. [Pirrotta Tr. 143:6-16].

101.    On September 19, 2002, Pouncy responded to Montanez's September 10, 2002 memorandum concluding that there was no evidence to corroborate his complaint of retaliation. [Mokotoff Ex. 15].  Robyn Roett, Montanez's supervisor, and then Danka's Director of U.S. Human Resources, advised Pouncy that Danka would investigate his claim and respond. [Pouncy Tr. 155:8-12] [Mokotoff Ex. 15].

102.    On October 3, 2002, Roett and Jacqueline Gayle Kelly ("Gayle-Kelly"), then

Danka's Director of Diversity Programs, responded to Pouncy's September 19, 2002 letter.

[Mokotoff Exs. 15 and 16].  They concluded that their investigation did not corroborate Pouncy's

allegations.  [Mokotoff Ex. 16].

103.    Roett and Gayle Kelly are African American.  [Pouncy Tr. 155:13-14]  [Pirrotta

Dec. ¶ 47].

104.    On October 9, 2002, Pouncy met with Pirrotta to follow up with some of his prior

complaints.  [Mokotoff Ex. 17].

105.    During this meeting, Pouncy acknowledged that Chase was willing to accompany

Pouncy on sales opportunities, but that Pouncy declined Chase's offers.  [Mokotoff Ex. 17].

106.    Pirrotta also instructed Pouncy to submit a business case justification setting forth

the basis for Pouncy's claimed need for additional territory.  [Mokotoff Ex. 17].  On October 21,

2002, Pirrotta responded to Pouncy's business case justification, explaining that Pouncy's

presently-assigned territory had sufficient opportunities for him to achieve his quota, and that

Pouncy was not maximizing his opportunities.  [Mokotoff Ex. 56].

**Minority Account List**

107.    In or about December 2003, Pouncy approached his Branch Manager, Lance

Redler ("Redler"), with a request that he be assigned additional accounts.  [Redler Dec. ¶ 6].

Pouncy had in his hand a book entitled the *Long Island Book of Lists* ("Book of Lists").  [Redler

Dec. ¶ 6].  This Book of Lists is a compilation of various businesses on Long Island grouped by

vertical market (*i.e.* similar type of business).  [Redler Dec. ¶ 6].  Some of the lists contained in

the Book of Lists include:  Accounting Firms, Advertising Agencies, Catering Facilities,

Engineering Firms & Consultants, Hotels/Motels, Law Firms, Staffing Services, Minority

Owned Firms and Woman Owned Firms.  [Redler Dec. ¶ 6].

108.    Pouncy and Redler discussed the various lists of potential customers, and Redler

agreed to assign Pouncy additional named accounts to enhance his existing Named Account list

and the opportunities he had to sell in Danka's open territories.  [Redler Dec. ¶ 7].  Redler told

Pouncy to pick any accounts he wanted and, as long as the account was not on another NAE's

existing NAE list, he could have the account.  [Redler Dec. ¶ 7].

109.    Pouncy *identified for Redler* the Minority Owned Firms list as a list that he would

like to cover.  [Redler Dec. ¶ 7].  This Minority Owned Firms list does not identify what type of

minority owns the particular business on the list.  [Redler Dec. ¶ 7].  Pouncy did not know if the

accounts on the minority account list were owned by African Americans.  [Pouncy Tr. 302:12-

15].

110.    Pouncy advised Redler that, as a minority, he believed he had an advantage in

selling to that particular vertical market, and specifically requested to be assigned accounts from

that list.  [Redler Dec. ¶ 8].  In particular, Pouncy was excited with the prospect of selling to Kiss

Productions, Inc., a company that was located in the same business complex as Danka's Port

Washington office.  [Redler Dec. ¶ 8].

111.    Redler agreed to Pouncy's request to be assigned additional accounts, and advised

Pouncy that he would review the lists in which he had expressed interest to confirm that the

companies were not already existing Danka customers, and then would provide him with a list of

customers.  [Redler Dec. ¶ 9].

112.    Because Redler had the Book of Lists available to him in electronic form, Redler

created a spreadsheet of the minority-owned businesses listed in the book and provided it to

Pouncy.  [Redler Dec. ¶ 10; Redler Ex. A].  Redler believes he also e-mailed Pouncy spreadsheets of other lists contained in the book.  [Redler Dec. ¶ 10].

113.     Redler did not remove *any* accounts from Pouncy's named account list in exchange for providing him with the list of minority owned accounts or any other list for that matter.  [Redler Dec. ¶ 11].

114.     Pouncy can identify *no* account that Redler took away from him.  [Pouncy Tr. 106:7-17, 107:4-11].

115.     Pouncy does not recall if he called on any of the accounts on the list.  [Pouncy Tr. 303:3-7].

**Pouncy's Documented History of Insubordination**

116.     On September 10, 2002, Pouncy received a written memorandum from Human Resources as a result of his unprofessional conduct on August 29, 2002.  [Mokotoff Ex. 13]. Specifically, Pouncy was observed speaking to a fellow employee, Samuel DeChelfin, in a loud, abusive and threatening manner, and entering a colleague's work area to remove a file without permission.  [*Id.*].  Pouncy was warned that failure to conduct himself in a businesslike manner could result in disciplinary action.  [*Id.*].

117.     On December 10, 2002, Danka employee Sonia Perez complained to Pouncy about his inappropriate attitude and tone during their conversation on that day.  [Mokotoff Ex. 14].  Perez forwarded her complaint memorandum to Pirrotta, Chase and Montanez.  [*Id.*].  By e-mail, Pouncy apologized to Ms. Perez.  [*Id.*].

118.     During an April 12, 2004 sales meeting in the Port Washington office, Pouncy and Redler engaged in a heated exchange of words.  [Mokotoff Ex. 20].  Both Pouncy and Redler were counseled regarding appropriate standards of business conduct.  [*Id.*].

119.    In mid-May 2004, Pouncy refused to sign his SCAF form because he wanted a raise and believed that signing his SCAF precluded him from receiving a raise.  [Pirrotta Tr. 155:13-20].  Pouncy ultimately signed the SCAF form "in protest" and he was not terminated. [Mokotoff Ex. 21].  Pouncy had previously resisted signing SCAF forms and, on each occasion, Pirrotta spoke with Pouncy about why he should sign the SCAF form, and Pouncy ultimately signed the form.  [Pirrotta Tr. 155:23-156:13].

120.    On June 30, 2004, Human Resources issued to Pouncy a "Final Warning" for engaging in a profanity-laden verbal tirade on June 24, 2004, directed toward fellow employee, Joseph Glassman, and for refusing to cooperate with Human Resources in its investigation of the complaint by Mr. Glassman.  [Mokotoff Ex. 22].

121.    On October 25, 2004, Redler issued a disciplinary memo to Pouncy as a result of his "Unprofessional Business Conduct" on October 22, 2004.  [Mokotoff Ex. 23].  Specifically, Pouncy engaged in a verbal confrontation with a member of Danka's Information Technology Department.  [Id.]  [Redler Dec. ¶ 13].  Pouncy was warned that his failure to conduct himself in a professional and businesslike manner may result in further disciplinary action, including termination.  [Mokotoff Ex. 23].

**Pouncy's October 2004 Disability/Sick Leave**

122.    In October 2004, Pouncy was absent from work for eight consecutive days due to a medical-related reason.  [Mokotoff Ex. 24].

123.    In accordance with Danka short term disability ("STD") policy, for absences of 7 days of duration or longer, the employee is compensated for the time off under Danka's short term disability leave, which pays up to 60% of the employee's average weekly salary.

[Mokotoff Ex. 24].  The STD policy does not permit the employee to use accrued sick leave or vacation leave as compensation for the time off.  [*Id.*].

124.    Danka policy require that employees who are absent for three or more consecutive days must provide a physician's verification prior to their return to work.  [Mokotoff Ex. 24].

125.    Danka sent Pouncy the STD documents during the time of his absence.  Pouncy returned to work on October 20, 2004, insisting that he be permitted to use his accrued sick time as compensation for his absence, and failing to provide the required physician verification.  [Mokotoff Ex. 24].

126.    Pouncy complained of "harassment" in October 2004 to Danka's corporate counsel, Jacqueline Gayle-Kelly, because of Danka's response to his request to use his accrued sick leave.  [Pouncy Tr. 242] [Mokotoff Ex. 24].

127.    Pouncy rejected Danka's efforts to explain its disability leave policy in emails authored by Jon Mortagua and Ms. Gayle-Kelly.  [Mokotoff Ex. 24].

128.    As an accommodation, Danka offered to permit Pouncy to use a Danka policy that was to go in effect in January 2005 in order for him to receive full compensation for his time off from work.  [Pouncy Tr. 248:10-14]  [Mokotoff Ex. 24].

129.    Pirrotta stopped Pouncy from being terminated in October 2004.  [Pirrotta Tr. 161:20-22].  Pirrotta spoke with Redler about the decision to give Pouncy another chance at employment.  [Pirrotta Tr. 162:18-21].

**Pouncy's Termination**

130.    In June 2004, Pouncy had submitted a vacation request for the period December 21, 2004-January 2, 2005.  [Mokotoff Ex. 27].  The request was approved by Lance Redler, but was not approved by Pirrotta, as per Danka policy.  [*Id.*].

131.    On a quarterly basis, sales representatives submit forecasts, which are estimates and expectations of anticipated sales within a quarter.  [Redler Dec. ¶ 15].

132.    As of December 2004, Pouncy had not met his sales quota for the entire fiscal year of 2004- **at least nine months**.  [Pirrotta Tr. 150:14-20].

133.    On Thursday, December 16, 2004, Redler sent an e-mail to all Port Washington NAEs regarding the end of the month forecasts, the end of the quarter forecasts, and the status of their sales.  [Redler Dec. ¶16]  [Mokotoff Ex. 26.  In the e-mail, Redler advised that vacation time was not guaranteed, and that sales representatives who had **not** made their monthly and quarterly forecasts were expected to work through the end of the year.  [*Id.*].

134.    Redler's December 16, 2004 e-mail reminded all NAEs that if they were not meeting their sales goals, they were expected to report to work on December 20, 2004, regardless of whether they had a scheduled vacation.  [Mokotoff Ex. 26]  [Redler Dec. ¶16].

135.    As of December 16, 2004, Pouncy's December forecast was $81,511, and Pouncy had sold $0.  [Mokotoff Ex. 26].

136.    On Friday, December 17, 2004, Pouncy called and told Redler that he would be taking a personal day on Monday, December 20, 2004.  [Redler Dec. ¶ 18].  Pouncy advised Redler that he had not closed the business to which he had committed in his forecast.  [Pirrotta Tr. 165:20-166:4]  [Mokotoff Ex. 55].

137.    During the December 17, 2004 call, Redler directed Pouncy to report to work on December 20, 2004 for the regularly scheduled Monday morning sales meeting.  [Redler Dec. ¶ 19].  Pouncy responded that he would be taking his vacation day, "no matter what [Redler said]."  [Redler Dec. ¶18; Ex. D].

138.    Pouncy did not report to work on December 20th, for the Monday morning sales meeting, as Redler directed.  [Redler Dec. ¶ 19]  [Mokotoff Ex. 55].  Other NAEs who had not made their sales reported to the office for the meeting.  [Redler Dec. ¶ 19].

139.    Redler called Pouncy on the morning of December 20, and Pouncy responded that he was taking a vacation day.  [Pirrotta Tr. 164:6-10]  [Mokotoff Exs. 26 and 55].  Redler told Pouncy that his refusal to report to work as directed was blatant insubordination.  [Redler Dec. ¶ 20]  [Mokotoff Ex. 55].  Pouncy responded that he was taking "his vacation time," and then hung up the telephone.  [Redler Dec. ¶ 20]  [Mokotoff Ex. 55].

140.    Danka terminated Pouncy on the morning of December 20, 2004.  [Mokotoff Ex. 25].  Redler, made the recommendation to terminate Pouncy.  [Redler Dec. ¶ 21]  [Pirrotta Tr. 147:17-20].  The decision was reviewed by a six-point check within Danka, and Pirrotta made the final decision to terminate Pouncy.  [Pirrotta Tr. 147:21-148:4].

141.    Redler and Jon Mortagua informed Pouncy of his termination.  [Pirrotta Tr. 146:25-147:7; 167:23-168:3].

142.    Danka informed Pouncy it was terminating him for his "refus[al] to appear at work by taking an unapproved vacation day," "consistent failure to meet performance standards and expectations," "insubordination," "consistent failure to follow company, divisional and/or district policies or procedures, and overall poor performance of []assigned duties as a Named Account Executive. . . ."  [Mokotoff Ex. 25].

143.    During the time Pouncy was employed by Danka, three white employees in Pouncy's region were terminated for unsatisfactory performance- Philip Saposnick (terminated on September 3, 2001), Richard Ritter (terminated on November 9, 2001), and Samuel DeChelfin (terminated on June 2, 2003).  [Pirrotta Dec. ¶ 48].

**Pouncy's EEOC Charge**

144.    On or about June 23, 2004, Pouncy filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that he had been discriminated against on the basis of his race (Black) and retaliated against because of complaints to management and Human Resources.  [Mokotoff Ex. 31].

145.    Danka received Pouncy's filed EEOC Charge after June 30, 2004.  [Pirrotta Dec. ¶ 50, Ex. D].

146.    Pouncy provided no less than thirteen (13) separate submissions to the EEOC from May 2004 through February 2006, concerning his allegations.  [Mokotoff Exs 28-37, 39-40, 43].

147.    On June 13, 2005, the EEOC wrote to Pouncy, advising him that, to date, he had described his complaints "in some detail," but he did "not state whether others of a different race experienced more favorable treatment under similar circumstances . . . Management decisions can be arbitrary or even unfair but that does not automatically make them discriminatory." [Mokotoff Ex. 38].  It asked him to provide further facts to support his claims.  [*Id.*]

148.    On July 18, 2005, the EEOC again wrote to Pouncy.  [Mokotoff Ex. 41].  In this communication, it advised Pouncy that it "appears that the entire first page refers to events some years back and therefore outside the statute of limitations.  You have arrived at your own conclusions as to why certain events took place but we cannot do so without full information permitting us to make objective comparisons, review documentation, etc."  It asked Pouncy to provide "additional information" per specific EEOC requests.  [*Id.*].

149.    On October 19, 2005, the EEOC again wrote Pouncy, advising him that **all** of his newest submissions were time-barred under Title VII.  [Mokotoff Ex. 42].  It further identified

the reasons why it believed no discrimination occurred, and advised Pouncy that his submissions were "not leading in the direction of a finding that discrimination had occurred." [*Id.*].

150.    On February 27, 2006, EEOC District Director Lewis advised that it did not agree there was "proof of discrimination" in the file, and further stated it was "unable to conclude that unlawful discrimination has occurred . . . ." [Mokotoff Ex. 44].

151.    On March 13, 2006, the EEOC summarized Pouncy's allegations and the reasons why it believed no discrimination or retaliation occurred. [Mokotoff Ex. 45]. It stated: "the Commission cannot conclude that you were the victim of race discrimination." [*Id.*]

152.    After a full investigation, on March 14, 2006, the EEOC issued a Dismissal and Notice of Rights letter. [Mokotoff Ex. 46].

**The Instant Lawsuit**

153.    On May 12, 2006, Plaintiff filed a Complaint with the *Pro Se* Office of the Southern District of New York. [Mokotoff Ex. 1]. The Complaint was filed in the Southern District of New York on June 21, 2006, alleging discrimination and retaliation in violation of Title VII. [*Id.*].

154.    On or about November 13, 2007, Plaintiff filed an Amended Complaint. [Mokotoff Ex. 2].

Respectfully submitted,

Dated: October 3, 2008                   FORD & HARRISON LLP

By:  _s/Jeffrey D. Mokotoff_____
      Jeffrey D. Mokotoff, *pro hac vice*
      Elana Gilaad
      100 Park Avenue, Suite 2500
      New York, New York 10017
      Phone:  212.453.5900
      Fax:  212.453.5959
      *Attorneys for Defendant Danka Office Imaging Company*

Atlanta:461630.1